482 So.2d 213 (1985)
Edward L. TOLIVER
v.
GENERAL MOTORS CORPORATION, et al.
No. 55647.
Supreme Court of Mississippi.
November 6, 1985.
As Modified on Denial of Rehearing February 12, 1986.
James P. Cothren, Cothren & Pittman, Jackson, Pat M. Barrett, Jr., Barrett, Barrett, Barrett & Patton, Lexington, for appellant.
Charles S. Tindall, III, W. Wayne Drinkwater, Lake, Tindall, Hunger & Thackston, Greenville, for appellees.
En Banc.
DAN M. LEE, Justice, for the Court:
This is an appeal from the Circuit Court of Holmes County. The appellant, Edward Toliver, was severely injured in an automobile accident on January 7, 1978, when his 1973 Chevrolet Vega was struck from the rear by a car owned by David Lee Thomas and driven by Roosevelt Mabry, Jr., with Thomas as a passenger.
Upon impact, Toliver's gas tank erupted, leaking gas into the passenger compartment, which ignited. Toliver was critically burned as a result of the accident, causing the almost complete destruction of his facial features, partial loss of use of his right hand and arm, severe damage to his lips and partial loss of his nose.
Toliver filed suit seeking $5,000,000 in actual damages and $25,000,000 in punitive damages against David Lee Thomas, Alice McBride, Administratrix of the Estate of John McBride, Jr. (who sold Toliver the used Vega), and General Motors Corporation. Both Thomas and McBride failed to answer or appear, and Toliver took a default judgment against them.
Toliver alleged that General Motors Corporation placed his 1973 Chevrolet Vega on *214 the market in an unreasonably dangerous and defective condition. Specifically, his complaint stated that the vehicle's fuel tank was inadequately designed to withstand punctures in rear-end collisions. He also alleged that General Motors negligently failed to warn consumers about the defective fuel tanks; that General Motors negligently failed to recall the 1973 Vega when it knew of its inherent danger; that General Motors knowingly decided to mass produce and market the automobile in its defective state in order to save the expense of correcting the problem; that General Motors negligently concealed knowledge of the defective design from consumers; and that General Motors breached its express and implied warranties of fitness for a particular purpose. Toliver charged that these wrongful acts on the part of General Motors proximately caused his injuries.
General Motors filed a motion to dismiss pursuant to Rule 12(b)(6) of the Mississippi Rules of Civil Procedure, for failure to state a claim upon which relief could be granted. The Plaintiff's action was dismissed.
The sole issue on appeal is whether Edward Toliver, who was injured in a collision between his Vega and another automobile, may assert a cause of action against the manufacturer of his Vega because his injuries were proximately caused or enhanced by the alleged defective design or construction. We hold that Toliver has asserted a cause of action, and overrule Walton v. Chrysler Motor Corp., 229 So.2d 568 (Miss. 1969), and the subsequent cases based on Walton. (Odum v. Glover, 413 So.2d 722 (Miss. 1982); Pattillo v. Cessna Aircraft Corp., 379 So.2d 1225 (Miss. 1980); Jones v. Babst, 323 So.2d 757 (Miss. 1975); Baker v. Ford Motor Co., 317 So.2d 51 (Miss. 1975); General Motors Corp. v. Howard, 244 So.2d 726 (Miss. 1971); and Ford Motor Co. v. Simpson, 233 So.2d 797 (Miss. 1970)).
We have previously held that no liability attaches to an automobile manufacturer in a "second impact" type case because the alleged defect in the automobile's design or manufacture did not proximately cause or proximately contribute to the collision. However, after careful consideration of the authorities cited by the appellant in his brief, we are convinced that the question of causation more properly is addressed to the instrumentality causing the enhanced injury, not that which caused the collision. "That the design defect does not cause the initial collision should make no difference if it is a cause of the ultimate injury." Volkswagen of America, Inc. v. Young, 272 Md. 201, 321 A.2d 737 (1974). See also Ford Motor Co. v. Hill, 404 So.2d 1049 (Fla. 1981); Brandenburger v. Toyota Motor Sales, Inc., 162 Mont. 506, 513 P.2d 268 (1973); Bolm v. Triumph Corp., 33 N.Y.2d 151, 350 N.Y.S.2d 644, 305 N.E.2d 769 (1973); Turner v. General Motors Corp., 584 S.W.2d 844 (Tex. 1979); Sumnicht v. Toyota Motor Sales, Inc., 121 Wis.2d 338, 360 N.W.2d 2 (1984). Furthermore, the overwhelming weight of authority holds, and we agree, that automobile accidents occur with sufficient frequency to be foreseeable to manufacturers. Atkins v. American Motors Corp., 335 So.2d 134 (Ala. 1976); Roberts v. May, 41 Colo. App. 82, 583 P.2d 305 (1978); Friend v. General Motors Corp., 118 Ga. App. 763, 165 S.E.2d 734 (1968), cert. dismissed, 225 Ga. 290, 167 S.E.2d 926 (1969); Buehler v. Whalen, 70 Ill.2d 51, 15 Ill.Dec. 852, 374 N.E.2d 460 (1977); Smith v. Ariens Co., 375 Mass. 620, 377 N.E.2d 954 (1978); Elsasser v. American Motors Corp., 81 Mich. App. 379, 265 N.W.2d 339 (1978); Friedrich v. Anderson, 191 Neb. 724, 217 N.W.2d 831 (1974); Devaney v. Sarno, 125 N.J. Super. 414, 311 A.2d 208 (1973), aff'd, 65 N.J. 235, 323 A.2d 449 (1974); Johnson v. American Motors Corp., 225 N.W.2d 57 (N.D. 1974); Leichtamer v. American Motors Corp., 67 Ohio St.2d 456, 424 N.E.2d 568 (1981); Mickle v. Blackmon, 252 S.C. 202, 166 S.E.2d 173 (1969); Engberg v. Ford Motor Co., 87 S.D. 196, 205 N.W.2d 104 (1973); Ellithorpe v. Ford Motor Co., 503 S.W.2d 516 (Tenn. 1973); Baumgardner v. American Motors Corp., 83 Wash.2d 751, 522 P.2d 829 (1974); Chrysler Corp. v. Todorovich, 580 P.2d 1123 (Wyo. 1978).
*215 In his complaint, Toliver alleged that General Motors mass produced and marketed the 1973 Vega with full knowledge and understanding that the placement of its fuel tank caused the automobile to be unreasonably dangerous to consumers. According to Toliver, General Motors, through crash tests of the vehicle, had determined that the fuel tank would be inadequately protected in the event of a rear end collision. The cost of correcting this design defect would have been minimal; however, General Motors decided to sell the automobile in its defective condition, rather than to incur the expense necessary to correct this condition.
If the appellant can prove his allegations at trial, he will clearly have established that General Motors Corporation was grossly negligent in the design and sale of the 1973 Vega. He has alleged the requisite elements to establish a cause of action based on negligence. Those elements include: 1. A duty requiring the defendant to conform to a certain standard of conduct; 2. A failure by the defendant to conform to that standard; 3. Proximate cause; and 4. Actual damage. W.L. Prosser, Handbook of the Law of Torts (4th ed. 1971) § 30. This Court has recognized today that automobile manufacturers have a legal duty to design vehicles that are not unreasonably dangerous to a user. Edward Toliver has asserted that his 1973 Vega was unreasonably dangerous, and that he was injured as the result of General Motors' willful failure to properly design the fuel tank in his automobile. He is entitled to a full trial on the merits to present his theory of negligence to a jury.
The next issue to be considered is whether the doctrine of strict liability, as expressed in Section 402A of the Restatement (Second) Torts (1965) applies to this case. We adopted the language of that Section in the case of State Stove Mfg. Co. v. Hodges, 189 So.2d 113 (Miss. 1966), and it states as follows:
Special Liability of Seller of Product for Physical Harm to User or Consumer 
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
This Section imposes liability, but not exclusive[1], on manufacturers who sell products to consumers, if the products are: (1) defective; and (2) unreasonably dangerous. The plaintiff need not prove negligence; in fact, (2)(a) imposes liability although the seller "has exercised all possible care... ." Negligence is supplied as a matter of law if the defendant markets a defective and unreasonably dangerous product which injures a consumer.
The rationale for the imposition of this absolute liability is two-fold: to shift the cost of injuries from the public to the manufacturer, Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 63, 27 Cal. Rptr. 697, 701, 377 P.2d 897, 901 (1962); and to assist the plaintiff in establishing what would otherwise be a near-impossible burden of proof. J.W. Wade, On the Nature of Strict Tort Liability for Products, 44 Miss.L.J. 825, 826 (1973). The first part of the rationale represents a policy decision. *216 As Justice Traynor stated in Greenman:
The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves.
59 Cal.2d at 63, 27 Cal. Rptr. at 701, 377 P.2d at 901. The second part of the rationale assists the plaintiff who could not, otherwise, satisfy his burden of showing how the product became defective. As Dean Wade has noted:
It is often difficult, or even impossible to prove negligence on the part of the manufacturer or supplier. True, res ipsa loquitur often comes to the aid of the injured party. But it is normally regarded as a form of circumstantial evidence, and this means that there must be a logical inference of negligence which is sufficiently strong to let the case go to the jury. This is often not present, and strict liability eliminates the need of proof.
Wade, Strict Tort Liability, supra.
Thus, where the plaintiff suffers injury due to, for example, defective glass in a ketchup bottle (Early-Gary, Inc. v. Walters, 294 So.2d 181 (Miss. 1974)), the doctrine of strict liability eliminates the necessity of his proving that the defect occurred through some specific fault of the manufacturer. He must prove, simply:
(1) that the plaintiff was injured by the product,
(2) that the injury resulted from a defect in the product which rendered it unreasonably dangerous, and
(3) that the defect existed at the time it left the hands of the manufacturer.
Id. at 186.
This is as it should be. Otherwise, the plaintiff would face the insurmountable burden of proving exactly at what point the glass became defective, and which agent of the defendant was negligent either in causing the condition, or in failing to detect it.
A case such as this clearly meets the criteria set out in Section 402A: the product proved to be defective, and it was unreasonably dangerous. The defective condition manifested itself in a glass ketchup bottle which shattered when hit on the bottom by the plaintiff's hand. "Ordinarily the phrase `defective condition' means that the article has something wrong with it, that it did not function as expected." State Stove, 189 So.2d at 121. Certainly, a ketchup manufacturer does not expect his bottles to shatter on the slightest impact, and when they do, the product has been sold in a defective condition.
Similarly, if a plaintiff were injured in an automobile which did not function as intended; e.g., he was thrown through a windshield because his seatbelt was not attached to the floor of his automobile, we would not hesitate to apply the doctrine of strict liability to the case. Clearly, the facts would demand such an application: the plaintiff was injured by a defective product which, under normal use, performed in a manner that was unreasonably dangerous.
Comment i. to Section 402A further defines the term "unreasonably dangerous", as it is used in the Section. It states that "The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer." Thus, the terms "defective condition" and "unreasonably dangerous" must be used in conjunction with each other. There must be a defect causing the product to malfunction, and that defect must create the unreasonably dangerous condition. In the case of a product which inadvertently becomes defective during the manufacturing process  through negligence or mistake  the two elements may be present.
However, we do not have such a case here. The plaintiff in the instant case does not allege that the fuel tank of his Vega was somehow mishandled during the manufacturing process. He has not said that some mysterious, unknown General Motors employee negligently or carelessly put this *217 particular fuel tank in the rear of the plaintiff's Vega. He does not allege that his automobile did not function as designed. Instead, Toliver asserts that General Motors made a conscious decision to improperly design his Vega so that it became unreasonably dangerous to him. We held in State Stove, "where the article was made as intended, and yet proves to be not reasonably safe, the phrase `defective condition' has no independent meaning. [cite omitted.] The issue is whether the product is `unreasonably dangerous' or not reasonably safe." 189 So.2d at 121.
We have applied the "unreasonably dangerous" standard in subsequent cases alleging defective design. In Hamilton Fixture Company, Inc. v. Anderson, 285 So.2d 744 (Miss. 1973), the unreasonably dangerous instrumentality was a humidifier which allowed excess moisture to damage the plaintiffs' home. The humidifier had been installed according to the manufacturer's instructions; however, it still malfunctioned. The jury returned a verdict for the plaintiffs, and we affirmed, holding that the issue of whether the humidifier was unreasonably dangerous was properly submitted to the jury. We reached this result even though we found it "apparent from the evidence that Hamilton exercised reasonable care in the design and installation of the humidifier... . [and] The evidence portrays quite clearly that the design of installation was the product of deliberate calculation exercised in a reasonable and prudent manner." Id. at 747. Strict liability was imposed upon Hamilton because the humidifier "was delivered to the Andersons for their use without change in its condition from the time of completion. It did not function in accord with its intended purpose and the property of the plaintiffs was injured thereby." Id.
In Dunson v. S.A. Allen, Inc., 355 So.2d 77 (Miss. 1978), the dangerous instrumentality at issue was a thinning shear used for cutting trees. The shear had no manufacturing defect; liability was predicated upon the design, which required it to be attached to a tractor which had no front shield. We applied the doctrine of strict liability to that case, holding that "the crucial question in this case is whether the thinning shear was defective or unreasonably dangerous... ." Id. at 78. As to the standard for determining "unreasonably dangerous", we held that "[t]he question of whether a product is reasonably safe is a flexible one and to be determined by the facts in each case." Id. at 79.
The problem that we encounter with this application of the doctrine of strict liability to cases involving design is that it precludes the consideration of evidence from the manufacturer as to the rationale for designing the product the way it was designed. As stated in Hamilton, the defendants were liable because the humidifier did not function properly, and injured the plaintiffs. The care which the manufacturer took to design the product was irrelevant to the issue of liability. The Alabama Supreme Court recognized this distinction in Atkins v. American Motors Corp., 335 So.2d 134 (Ala. 1976), when it noted that strict liability "look[s] to the dangerous characteristics of the end product, rather than the methods or processes by which it was produced. This represents a shift in emphasis from the manufacturer's or retailer's conduct to the performance of his product." Id. at 140.
Some might argue that the submission of the issue of whether the product is unreasonably dangerous to the jury allows some consideration of the manufacturer's conduct  or alternatives  in designing the product. However, we view with concern Section 402A(2)(a), which imposes liability although "the seller has exercised all possible care in the preparation and sale of his product... ." This subsection creates liability for a product solely due to its performance, without regard to the care taken in its design.
The danger inherent in such an approach can be readily seen in the instant case. Toliver alleges that his injuries resulted from the placement of a fuel tank in the rear of his Vega. Under the theory of strict liability, we would have to find that *218 General Motors, which is in the business of selling cars, sold a Vega which eventually came into Toliver's possession. At least with regard to the placement of the fuel tank, we may assume that it reached him in a substantially unchanged condition. After a collision with another car, the fuel tank exploded, and Toliver was severely injured. Was the car in a defective condition? Not in the sense of State Stove, which requires that the product leave the manufacturer in a condition other than that which was intended. Was the car unreasonably dangerous? That would be an issue for the jury to decide. However, by virtue of Section 402A(2)(a), the jury could not consider evidence as to the care taken by General Motors in designing the Vega. In considering only the performance of the product, a jury could easily determine that any car that blows up is unreasonably dangerous.
The current state of the art in automobile design requires that fuel tanks be affixed somehow to automobiles, in order to supply gas engines with fuel. The simple fact is that the fuel tanks have to go somewhere, and any location is likely to be hazardous under some circumstances. Regardless of whether the tanks are placed on the roof, under the body, in the back, or out the front, some type of impact  sufficiently strong and in just the right location  can rupture the fuel tanks and ignite their contents. The duty of the manufacturer is to weigh the likelihood of collision against the most susceptible impact points, and to place the fuel tank in the safest place possible. In determining placement, the automobile engineer must consider aerodynamics, cost, and industry standards. Under negligence law, these factors may be considered as evidence of product utility and used to determine the standard of care. Under our strict liability law, these factors are meaningless.
Dean Wade advocated the desirability of limiting the strict liability doctrine when he stated that the doctrine should be "confined to the product which has its `defect' developed unintentionally in the manufacturing process, thus leaving the design and warning cases to be handled under the negligence technique." Wade, supra, at 837. In design cases, he argued, negligence may be more easily established by the plaintiff. Since the manufacturer has complete control over the design process, he "either knows of the danger which the design creates or should know (i.e., is negligent in not knowing of it)... ." Wade, supra, at 841.
We do not adopt this view, and we believe that such distinctions muddy the waters. Strict liability is a viable, desirable doctrine, and it has been adopted by this Court. The problem with its application in this case goes back to our interpretation of Section 402A in State Stove: that the terms "defective condition" and "unreasonably dangerous" can somehow be separated from each other. They cannot. In a design case, just as in the case of a manufacturing defect, the plaintiff must show that the product was defective and that its defective condition made the product unreasonably dangerous to him. Comment g. to Section 402A defines defective condition as "a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." In the context of fuel tank design, obviously the plaintiff contemplated that the automobile which he purchased had a fuel tank affixed to it, which could become dangerous under some circumstances. Therefore, in order to make out his prima facie case, he must show that the placement of the tank on the car that injured him was defective: that it fell below the standard of automotive design contemplated by the user, and, thus, became unreasonably dangerous to him. See, e.g., Ford Motor Co. v. Matthews, 291 So.2d 169 (Miss. 1974).
To prove his case, the plaintiff may introduce evidence of industry standards, to show deviation therefrom, or an alternate design, to show the feasibility thereof. The defendant may then offer evidence in rebuttal.[2]
*219 We hold, then, that Edward Toliver may bring his cause of action under a theory of strict liability, where he will be required to show that his automobile was in a defective condition, unreasonably dangerous to him, that the defect existed when General Motors sold his Vega, and that he was injured by that defect. We note that Toliver may also bring his action under a theory of negligence. As we held in State Stove, strict liability "does not preclude liability based upon the alternative ground of negligence of the seller, where such negligence can be proved." 189 So.2d at 118. We reiterated this view in Hamilton, 285 So.2d 744. Under this theory, the usual defenses to a charge of negligence would apply.
In conclusion, we find that Edward Toliver has stated a cause of action upon which relief may be granted. We, therefore, reverse the trial court's dismissal under Rule 12(b)(6) and remand this case for a trial on the complaint.
REVERSED AND REMANDED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and HAWKINS, PRATHER, ROBERTSON and SULLIVAN, JJ., concur.
ANDERSON, J., not participating.
NOTES
[1] The rule is not exclusive and does not preclude liability based upon an alternative ground of negligence of the manufacturer or vendor where such negligence may be proved. State Stove, supra.
[2] It is noted that Sections 401, 402 and the comments thereto, of the Mississippi Rules of Evidence, effective January 1, 1986 relax and therefore broaden the scope of admissibility of all relevant evidence.